## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| COLON L. CARTER | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 2:17-cv-00398-JAW |
| v. | ) | |
| | ) | |
| AETNA LIFE INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON MOTIONS FOR JUDGMENT ON THE RECORD

Plaintiff alleges the defendant, an insurance plan administrator, unlawfully denied his claim for benefits under a long-term disability insurance policy that the defendant issued to and through plaintiff's employer. Both parties move for judgment on the administrative record. Having reviewed the record and having applied the high arbitrary and capricious standard to the insurer's denial of disability benefits, the Court concludes that the insurer had a reasonable basis and sufficient evidence to deny the plaintiff's claim for benefits. The Court therefore grants the insurer's and denies the plaintiff's motion for summary judgment.

## I.    BACKGROUND

### A.    Procedural History

On October 10, 2017, Colon L. Carter, filed a complaint against Aetna Life Insurance Company (Aetna), alleging that Aetna, which provides long-term disability insurance governed by the Employee Retirement Income Security Act (ERISA) through Mr. Carter's employer, Bath Iron Works (BIW), arbitrarily and capriciously

denied Mr. Carter's claim for long-term disability benefits. *Compl.* ¶¶ 6-7, 10, 30 (ECF No. 1). Aetna answered Mr. Carter's Complaint on December 11, 2017. *Answer* (ECF No. 8). On January 3, 2018, Aetna filed the declaration of Adam Garcia, who is employed by Aetna and who was familiar with Aetna's files and records as they relate to Mr. Carter. *Decl. of Adam J. Garcia* ¶¶ 1-3 (ECF No. 10) (*Decl.*).

On March 20, 2018, Mr. Carter filed a motion to amend his Complaint to assert that his claim is governed by a de novo standard of review, *Mot. to Amend* (ECF No. 18); the Magistrate Judge denied the motion to amend on May 17, 2018. *Decision and Order on Pl.'s Mot. to Amend* (ECF No. 21) (*Order on Mot. to Amend*). On June 5, 2018, Mr. Carter filed a motion for judgment on the administrative record. *Mot. for J. on the Administrative R. with a Supporting Mem. of Law* (ECF No. 22) (*Pl.'s Mot.*); *Mot. for J. on the Administrative R. with a Supporting Mem. of Law* Attach. 1, *App. to Mot. for J. on the Administrative R.* (ECF No. 22) (*Pl.'s App. of Facts*). The next day, Aetna filed a motion for summary judgment on the administrative record. *Mot. for Summ. J. on the Administrative R.* (ECF No. 24) (*Def.'s Mot.*); *Mot. for Summ. J. on the Administrative R.* Attach. 1, *Aetna Life Insurance Company's App. Statement of Facts* (ECF No. 24) (*Def.'s App. of Facts*). On July 10, 2018, both parties responded to each other's motions, with Aetna also filing a response to Mr. Carter's statement of facts from the administrative record. *Pl.'s Resp. to Def.'s Mot. for J. on the Administrative Record* (ECF No. 22) (*Pl.'s Opp'n*); *Def.'s Opp'n to Pl.'s Mot. for J. on the R.* (ECF No. 29) (*Def.'s Opp'n*); *Def.'s Opp'n to Pl.'s App. of Facts* (ECF No. 28) (*Def.'s Opp'n to Pl.'s App.*).

## B. Statement of Facts

### 1. The Parties

BIW, a subsidiary of General Dynamics, employed Colon L. Carter as an estimating analyst. *Administrative R.* at 1104; *Def.'s Opp'n to Pl.'s App.* ¶ 3. As part of his job, Mr. Carter was responsible for: "[d]eveloping cost proposals for new Navy and commercial work; [d]eveloping and maintaining proposal support documents and checklists; [c]reating financial models; maintaining company baselines for all Programs; [a]ssisting management with department staffing plans; [and] Earned Value Management System (EVMS) Analysis." *Administrative R.* at 430. This position has a sedentary physical demand level. *Id.* at 10, 384, 390. Mr. Carter's last day of work at BIW was December 20, 2015 and he applied for short-term disability benefits thereafter, which BIW paid.[1] *Id.* at 10, 16, 23. Mr. Carter received short-term disability benefits after he stopped working at BIW.[2] *Id.* at 23.

"Aetna is a fiduciary under [s]ection 503 of Title 1 of [ERISA] as amended and has complete authority to review all denied claims for benefits under [its] policy." *Id.*

---

[1]     Mr. Carter states he filed his claim for short-term disability benefits "due to his complex regional pain syndrome, status-post cervical discectomy and fusion." *Pl.'s App. of Facts* ¶ 3. Aetna qualifies this fact, admitting that Mr. Carter's last day of work was December 20, 2015 and that he filed for short-term disability benefits. *Def.'s Opp'n to Pl.'s App.* ¶ 4. Aetna disputes Mr. Carter's assertion that he filed for short-term disability benefits due to "his complex regional pain syndrome, status-post cervical discectomy and fusion[]" as not supported by the record citation and as the record is unclear as to why Mr. Carter stopped working. *Id.*

      The Court agrees with Aetna that Mr. Carter's record citation does not demonstrate he filed for short-term disability benefits because he was suffering complex regional pain syndrome, status-post cervical discectomy and fusion and the Court modifies the assertion.

[2]     Mr. Carter states BIW paid his short-term disability benefits. *Pl.'s App. of Facts* ¶ 5. Aetna admits this fact but qualifies its response insofar as Aetna states it is unclear which entity paid Mr. Carter those benefits. *Def.'s Opp'n to Pl.'s App.* ¶ 5. But in its statement of facts, Aetna says these benefits were paid by Mr. Carter's employer. *Def.'s App. of Facts* ¶ 21.

      The Court includes that BIW paid Mr. Carter's short-term disability benefits.

at 1098 (internal quotation marks omitted).  Aetna has discretionary authority in determining if, and to what degree, beneficiaries are entitled to benefits.  *Id.*

## 2. The Long-Term Disability Plan

Mr. Carter was eligible to participate in the General Dynamics Non-Represented Long-Term Disability – Core and Buy-Up Plan Long-Term Disability Plan (the Plan).  *Id.* at 1065, 1078; *Answer* ¶ 6.  The Plan is underwritten by and provided as part of the group life and accident and health insurance policy which is provided to General Dynamics by Aetna with a group policy number of "GP-100515." (the Policy).  *Administrative R.* at 1042, 1075.  The Plan provides that additional provisions are applicable to beneficiaries, which "are described . . . in the group contract."  *Id.* at 1055 (emphasis omitted).  "[R]egular full-time employees of Bath Iron Works who are non-represented salaried employees are [eligible] for benefits under the Plan."  *Id.* at 1065.

The Plan's summary of coverage identifies the "Group Policy" as "GP-100515" [and the summaries of coverage (SOC) as 1a]."  *Id.* at 1064, 1075.  The summary of coverage further identifies policy form "GR-29", which is imprinted on the bottom left corner of Aetna's "Group Life and Accident and Health Insurance Policy."  *Id.* at 1069. The summary of coverage states that the summary plan description consists of the information provided for in the section entitled "Additional Information Provided by General Dynamics Corporation."  *Id.* 1040-61.

The Policy includes a "Face Page, Index, [a] Policy Contents page, and all the provisions of Parts I and II; and [t]he provisions found in the Certificate(s) [Cert Base

1 SOC 1a].” *Id.* at 1077. Certificate Base document 1, SOC 1A, is the long-term disability plan at dispute. *Id.* Regarding ERISA matters, the Policy states “Aetna shall be deemed to have properly exercised such authority. It must not abuse its discretion by acting arbitrarily and capriciously. Aetna has the right to adopt reasonable: policies; procedures; rules, and interpretations; of this policy to promote orderly and efficient administration.” *Id.* at 1098. Under the Policy, the test of disability provides:

> From the date you first become disabled and until Monthly Benefits are payable for 18 months, you will be deemed disabled on any day if: you are not able to perform the **material duties** of your **own occupation** solely because of: disease or **injury**; and your work earnings are 80% or less of your **adjusted predisability earnings**. After the first 18 months that any Monthly Benefit is payable during any period of disability, you will be deemed to be disabled on any day if you are not able to work at any reasonable occupation solely because of: disease or injury. If your own occupation requires a professional or occupational license or certification of any kind, you will not be deemed to be disabled solely because of the loss of that license or certification.

*Id.* at 1043 (emphasis in original).

> “Own Occupation” is defined as:

> [T]he occupation that you are routinely performing when your period of disability begins. Your occupation will be viewed as it is normally performed in the national economy instead of how it is performed: for your specific employer; or at your location or work site; and without regard to your specific reporting relationship.

*Id.* at 1057. The term “Material Duties” is defined as the duties that “are normally required for the performance of your own occupation; and cannot be reasonably: omitted or modified.” *Id.* (emphasis omitted). The Plan limits coverage to 24 months for certain conditions, including chronic pain syndrome. *Id.* at 1045.

### 3.    Mr. Carter's Long-Term Disability Claim

#### a.    Procedural History

Mr. Carter applied for long-term disability benefits on May 4, 2016.[3] *Id.* at 1103. He claimed disability for chronic neuropathic pain, chronic spinal disorder, and chronic pain syndrome. *Id.* at 180. Aetna denied Mr. Carter's claim for long-term disability benefits on August 2, 2016. *Id.* at 155-57. If approved, Mr. Carter's benefits would have begun June 20, 2016. *Id.* at 180. He appealed this decision on January 30, 2017.[4] *Id.* at 401. Aetna denied Mr. Carter's appeal on April 3, 2017. *Id.* at 180-85.

#### b.    Mr. Carter's Medical History

Mr. Carter has a history of spinal surgeries. His first surgery was in 2003 to remove a cancerous tumor on his lumbar spine. *Id.* at 23, 579. In early June of 2012, Mr. Carter underwent a left C6-7 microlaminotomy for a C7 radiculopathy and a C7 root foraminotomy. *Id.* at 23, 494, 943. On January 15, 2015, Mr. Carter had a C6-C7 anterior cervical discectomy and fusion due to a C6-7 herniated disk osteophyte complex with C7 radiculopathy, left greater than right, performed by Dr. Robert Ecker. *Id.* at 540-41.

 On March 2, 2015, Mr. Carter was involved in a car accident which resulted in shoulder pain, pain at the base of his neck, as well as some numbness in his left

---

[3]    Mr. Carter states that he applied for long-term disability benefits on May 3, 2016. *Pl.'s App. of Facts* ¶ 6. Aetna denies this fact and argues that the record shows that while Mr. Carter signed and dated his application on May 3, 2016, he did not actually file his claim until May 4, 2016. *Def.'s Opp'n to Pl.'s App.* ¶ 6. The record shows that Mr. Carter's application was filed on May 4, 2016, and the Court incorporates that fact.

[4]    Aetna admits the fact but denies that the Mr. Carter's record citation supports the fact. *Def.'s Opp'n to Pl.'s App.* ¶ 8. The record citation by Mr. Carter supports this fact.

arm, some of which he experienced before the accident.[5] *Id.* at 625-29. After the accident, Dr. Samuel Umbriaco found Mr. Carter to have normal strength in his bilateral upper extremities and found his neurologic exam normal. *Id.* at 627.

In 2015, Mr. Carter went to physical therapy, and, in his patient discharge summary, Mr. Carter's physical therapist stated:

> I regret that Mr. Carter has reached the plateau with his course of physical therapy. He continues to have left shoulder pain that radiates into his left hand. His clinical findings suggest nerve impingement. He is ready for discharge to an independent program; however, may be appropriate for return to physical therapy if his medical team is able to lower his pain level. Goals achieved:
>
>> 1. Able to perform all work tasks including keyboarding without significant restrictions – not fully achieved as patient is performing his tasks but with pain.
>>
>> 2. Able to sleep for greater than 6 hours without waking in pain – not yet achieved.
>>
>> 3. Full and symptom-free AROM of the left shoulder and cervical spine – not yet achieved. Able to lift and carry two bags of groceries with good body mechanics and without restrictions – improving. Independent with a home exercise program – achieved.

*Id.* at 652.

On May 6, 2015, Mr. Carter had an MRI on his lumbar spine which indicated

---

[5]     Mr. Carter asserts "[t]he day he returned to work after this surgery, March 2, 2015, the Plaintiff's vehicle was struck by another vehicle in his employer's parking lot which resulted in worsening left shoulder pain, numbness and tingling on his left upper extremity, and pain at the base of his neck." *Pl.'s App. of Facts* ¶ 12. Aetna qualifies this statement, admitting that Mr. Carter was involved in a vehicular accident on March 2, 2015 but denying that it occurred in Mr. Carter's employer's parking lot and that it "resulted in worsening left shoulder pain, numbness and tingling on his left upper extremity, and pain at the base of his neck" as not being supported by the record. *Def.'s Opp'n to Pl.'s App.* ¶ 12. Aetna cites a medical record from February 13, 2015, which states that Mr. Carter went to work two weeks after his January 15 surgery, and that he initially did not have any pain. *Id.* The Court modifies Mr. Carter's assertion to more closely hew to the record.

"a broad-based posterior disk bulge with right-sided annular tear at L4-5 resulting in crowding of the lateral recesses, right greater than left [, and ][t]here [was] contact of the traversing L5 nerve roots which could be contributing to the his symptom," which was "not significantly changed when compared to the prior exam." *Id.* at 561.

In September of 2015, Mr. Carter went to Gardiner Family Chiropractic "for evaluation and treatment of left sided neck, shoulder, and left arm radiculopathy that was exacerbated by a motor vehicle accident on 3/2/15." *Id.* at 775. Karen A. Biser, D.C., stated that after the car accident, Mr. Carter's "symptoms did return over time", and while he had some temporary relief, "his pain and the burning in his arm was . . . easily exacerbated by the simplest tasks such as reaching in front of himself to pick up a cup." *Id.* She indicted that "[h]is pain does indeed limit his ability to perform work-related tasks such as reaching, lifting, carrying, traveling, and prolonged computer work because these activities can and often do aggravate his symptoms." *Id.* Dr. Biser stated Mr. Carter's "care was spaced out . . . until he was eventually dismissed . . .because his symptoms had plateaued." *Id.* She also noted, however, that "Mr. Carter still comes in for care to help with his pain levels about every 4 weeks or so at this point. This helps temporarily with his range of motion and pain levels, but does not eliminate his symptoms." *Id.* Mr. Carter's treatment plan with Dr. Biser was: "3x times weekly for 2 weeks; twice weekly for 4-6 weeks; once weekly for 6 weeks; and then every 2 weeks for 4-6 visits."[6] *Id.*

---

[6]     Mr. Carter asserts Dr. Biser stated in her June 27, 2016 letter: "After the car accident on March 2, 2015, his [left arm radiculopathy pain] symptoms did return over time and he sought conservative care at this office. Colon had some temporary relief of his symptoms while being treated but his pain and burning in his arm was and is easily exacerbated by the simplest of tasks such as

In early January of 2016, Dr. Totta, a psychiatrist and pain specialist, stated that Mr. Carter unfortunately had lost his son in a motor vehicle incident and that the stress from this event "flared his pain." *Id.* at 958. Mr. Carter described the pain to Dr. Totta as "constant [and] burning" and Dr. Totta had the impression that Mr. Carter had neuropathic pain. Dr. Totta did not conduct any clinical examinations but stated, "[not] easy to tell status [illegible] emotional stress. Some cognitive effect -- ? -- concentration." *Id.* On February 2, 2016, Dr. Totta met with Mr. Carter, and did not perform an examination of Mr. Carter, but Mr. Carter stated he was experiencing "intense left sided burning" and "not seeing an [illegible] improvement." *Id.* at 957.

On March 8, 2016, fifteen months post cervical discectomy and fusion, Mr. Carter complained to his surgeon, Dr. Ecker, that he was experiencing "significant pain down his right arm over the biceps to his right thumb and index finger," and Dr. Ecker assessed that Mr. Carter had chronic left C6 radiculopathy, and scheduled him "to speak with Dr. Pisini about spinal cord simulator and this in conjunction with pain management by his PCP are likely the best choices at this time."[7] *Id.* at 605-06.

---

reaching in front of himself to pick up a cup. He has been co-managed by pain specialists and his neurosurgeon for chronic pain associated with radiculopathy. His pain does indeed limit his ability to perform work-related tasks such as reaching, lifting, carrying, traveling and prolonged computer work because these activities can and often do aggravate his symptoms." *Pl.'s App. of Facts* ¶ 16. Aetna qualifies this quote as out of context and asserts Mr. Carter misuses the parenthetical "[left arm radiculopathy pain]," and omits important sections from Dr. Biser's letter. *Def.'s Opp'n to Pl.'s App.* ¶ 16. The Court includes omitted sections of the June 27, 2016 letter to provide more context.

[7] Mr. Carter asserts "[o]n March 8, 2016, 15 months post cervical discectomy and fusion, the Plaintiff's surgeon, Dr. Ecker, stated that the Plaintiff had chronic left C6 radiculopathy and that he was scheduled to speak with Dr. Pisini about a spinal cord stimulator which in conjunction with pain management are his best choices at this time." *Pl.'s App. of Facts* ¶ 17. Aetna qualifies this assertion as "cherry-picking" and notes during this visit Mr. Carter complained of right arm pain, which contrasts with what he asserted on other occasions. *Def.'s Opp'n to Pl.'s App.* ¶ 17.

On April 6, 2016, on referral from Dr. Ecker, Mr. Carter saw Dr. James Pisini, a neurosurgeon, regarding the possibility of surgery to implant a spinal cord stimulator to try and reduce his current pain. *Id.* at 939. In his consultation note, Dr. Pisini wrote, regarding Mr. Carter, "1. Chronic neuropathic pain to left upper extremity and left lower extremity. 2. Status postlaminectomy syndrome of both the cervical and lumbar spine. 3. History of malignant spinal tumor." *Id.* at 939. In recommending that Mr. Carter not undergo spinal cord stimulation, Dr. Pisini stated:

> First of all, the extensive location of his pain makes it impossible to cover with a single or possibly even more spinal cord stimulators, in which case the success rate is extremely low when one cannot capture virtually 100% of a patient's painful area. Whenever there is pain in multiple regions of the body, particularly upper and lower extremity, not only is it impossible to cover all that with a spinal cord stimulator but often very difficult to treat it effectively. In addition to that, the fact that he has had a laminectomy at the C6-7 level would make it contraindicated to pass a percutaneous electrode from the thoracic region up into the cervical region, and therefore, the only possible option would be a surgically placed paddle lead if even one was to entertain spinal cord stimulation for his cervical and arm pain. In addition, he does require routine MRIs because of his history of malignant tumor, and having multiple electrodes in the epidural spaces would certainly impair not only potentially the ability to receive an MRI but also the quality of the images. Given those 3 major drawbacks and my opinion to consider spinal cord stimulation, I really do not think it is a viable option for him at this time.[8]

*Id.* at 939

On May 5, 2016, in an attending physician statement, Dr. Totta noted that Mr.

---

The Court disagrees with Aetna's view of Mr. Carter's paraphrasing but adds that Mr. Carter did complain of right arm pain as the record reflects.

[8] Aetna qualifies the statement by Dr. Pisini submitted by Mr. Carter omitted two words: "to" where Dr. Pisini stated "contraindicated to pass" and "potentially" where Dr. Pisini stated "impair not only potentially the ability". *Def.'s Opp'n to Pl.'s App.* ¶ 19. Aetna also says those words were in bold in the original consultation note. *Id.* The record reflects these words were omitted and the Court inserts them accordingly. However, contrary to the Aetna's assertion, neither was in bold.

Carter could not work due to neuropathic pain and that his pain made sedentary work difficult. *Id.* at 1100-01. However, Dr. Totta also found Mr. Carter was able to work with others, give supervision, work cooperatively with others in group setting, endorse checks, and direct the use of check proceeds. *Id.* at 1101. In terms of objective measures to substantiate the impairment, Dr. Totta stated, "pending spinal cord stimulation eval[uation.]" *Id.*

Mr. Carter underwent two lidocaine infusions on April 20, 2016 and May 27, 2016.[9] *Id.* at 613-23.

On May 27, 2016, Dr. Totta completed Aetna's capabilities and limitations worksheet and stated Mr. Carter's "capacity is limited by perceived pain – there is no specific neurological deficit or objective incapacity." *Id.* at 953. Dr. Totta wrote that Mr. Carter could "occasionally" perform the activities described therein, such as "lifting", "pulling", and "carrying." *Id.* Approximately two weeks later, filling out an attending provider statement, Dr. Totta stated that Mr. Carter could still perform "light, intermittent physical work, cognitive skills [illegible] breaks." *Id.* at 952.

In mid-June 2016, Jody Tague, an Aetna employee and registered nurse, conducted a clinical review based on submitted information pertaining to Mr. Carter's

---

[9]     Mr. Carter asserts he underwent these two infusions on April 20, 2016, and May 27, 2016, and cites pages 615-16, 623-24 of the administrative record to support his assertion. *Pl.'s App. of Facts* ¶ 20. Aetna qualifies this assertion by admitting to the facts but denying that Mr. Carter cited the correct pages in the administrative record, and points to pages 613-23 of the administrative record. *Def.'s Opp'n to Pl.'s App.* ¶ 20. Aetna is correct, and the Court uses Aetna's citation.

     Mr. Carter asserts on February 17, 2018, Administrative Law Judge Ellen Parker Bush found him disabled and awarded him Social Security disability benefits. *Pl.'s App. of Facts* ¶ 21. Aetna denies this assertion and states Mr. Carter provided no record citation to support it. *Def.'s Opp'n to Pl.'s App.* ¶ 21. The Court agrees with Aetna: Mr. Carter has not provided a citation for this assertion. The Court omits it.

claim and concluded that the medical records were insufficient to determine Mr. Carter's functional capacity for June 20, 2016. *Id.* at 37-40. Nurse Tague noted the need for "procedure reports and effectiveness of treatment; objective, measurable physical exam findings . . .." *Id.*

After Nurse Tague's assessment, on July 21, 2016, Mr. Carter's primary care physician, Dr. Roy Nakamura, completed the Aetna's attending provider's statement. *Id.* at 452. In that statement, Dr. Nakamura wrote that the Mr. Carter had undergone "3 prior surgeries – 2003, 2012, [] 2015", and stated the Mr. Carter is "not able to focus on tasks due to chronic pain. Impairment from chronic opioid treatment. Significant physical limitations." *Id.* Dr. Nakamura also stated that Mr. Carter's next visit would be "as needed", Mr. Carter could "do activities of daily living" but did not include a medical record to support his physician statement.[10] *Id.*

That same day, Dr. Nakamura completed Aetna's capabilities and limitations worksheet. *Id.* at 453. In that form, Dr. Nakamura stated the Mr. Carter is limited to "occasional" (defined in this form as 1-33% or .5-2.5 hrs. in an eight-hour workday) sitting and standing and cannot perform frequent flexion and rotation of his neck. *Id.* Dr. Nakamura determined that Mr. Carter could occasionally lift a maximum of

---

[10]     Mr. Carter asserts that "[o]n July 21, 2016, the Plaintiff's primary care physician, Roy Nakamura, MD, completed the Defendant's attending provider's statement. In that statement, Dr. Nakamura stated that the Plaintiff had undergone "3 prior surgeries – 2003, 2012, 1-2015", and stated the Plaintiff is "not able to focus on tasks due to chronic pain. Impairment from chronic opioid treatment. Significant physical limitations." *Pl.'s App. of Facts* ¶ 22. Aetna admits the above quotation but asserts the record citation also shows that Mr. Carter's next visit to Dr. Nakamura was "as needed," that Dr. Nakamura concluded Mr. Carter still could "do activities of daily living," and that Dr. Nakamura did not submit a medical record to support his responses. *Def.'s Opp'n to Pl.'s App.* ¶ 22. The Court includes Dr. Nakamura's other statements in the attending provider's statement; there is no medical record attached to it.

eleven to twenty pounds, that he could operate a motor vehicle, and keep his head and neck in a static position.[11] *Id.* In his opinion, Mr. Carter could not work, but Dr. Nakamura did not provide clinical findings in support of his view. *Id.* at 948.

Around July 28, 2016, Nurse Tague conducted another review of Mr. Carter's claim. *Id.* at 49. Nurse Tague again determined that Mr. Carter's medical records were insufficient to support his claim. *Id.* at 51. She noted that it was unclear how Mr. Carter's condition changed in December 2015 which prompted him to be out of work. *Id.* Nurse Tague highlighted the lack of "objective, measurable physical exam findings [to support his claim.]" *Id.*

### c.     First Denial of Long-Term Disability Claim

On August 2, 2016, William Diaz, a senior LTD Benefits manager at Aetna, informed Mr. Carter that his claim for long-term disability benefits was denied. *Id.* at 155-57. Mr. Diaz noted the lack of "tests or objective records supporting" Mr. Carter's claim, and that in Aetna's view, the records submitted did not include "findings of range of motion in degrees of upper extremities or spine, strength, tone, [or] reflexes of lower extremities." *Id.* at 155-56. The letter stated that Aetna concluded Mr. Carter did not meet the definition of disability, that he had returned to work after previous back surgeries, and that it was not evident what happened in

---

[11]     Mr. Carter asserts that "[o]n On July 21, 2016, Dr. Nakamura also completed the Defendant's capabilities and limitations worksheet. In that completed form, Dr. Nakamura stated the Plaintiff "is limited to 'occasional' (defined in this form as 1-33% or .5-2.5 hrs. in an 8-hour workday) sitting and standing, and cannot perform frequent flexion and rotation of his neck." *Pl.'s App. of Facts* ¶ 23. Aetna qualifies this assertion insofar as it admits to the quoted language cited by Mr. Carter, but also notes that the worksheet cited by Mr. Carter also stated that Mr. Carter could occasionally lift eleven to twenty pounds, operate a motor vehicle, and could keep his head and neck in a static position. *Def.'s Opp'n to Pl.'s App.* ¶ 23. The Court includes the additional statements provided by Dr. Nakamura in the capabilities and limitations worksheet cited by Aetna.

December 2015 that prevented him from doing his sedentary occupation. *Id.* at 156. The letter also stated that Mr. Carter could appeal Aetna's denial of his claim and could submit additional information and documentation pertaining to his claim from January 1, 2016 to then. *Id.* at 156-57.

### d. Mr. Carter's Appeal of His Denial of Long-Term Disability Benefits

Mr. Carter appealed Aetna's denial on January 30, 2017. *Id.* at 401. A few days later, Mr. Diaz reviewed Mr. Carter's appeal. *Id.* at 60. In Mr. Carter's appeal letter, he argued that Aetna failed to conduct a full comprehensive review of his medical records, that those records show he is disabled, and that Aetna failed to follow its own policies. *See id.* at 401-28.

As part of his appeal, Mr. Carter attached a summary of all his absences from work while he was at BIW to demonstrate how often he would have to miss work allegedly due to his disability. *Id.* at 423, 438-39. However, the BIW employee absence summary does not identify the specific reasons why Mr. Carter took sick days. *Id.* at 438-39. Mr. Carter submitted an occupational analysis and transferable skills analysis prepared by a vocational consultant, in which she concluded that Mr. Carter could not perform the duties of his job. *Id.* at 463. Mr. Carter offered his examination results from Maine Disability Determination Services from November 4, 2016, which were part of his application for Social Security Disability Insurance Benefits. *Id.* at 864-66. The disability claims adjudicator, Ms. Brushwein, noted that Mr. Carter's "left sided pain limits range of motion" but concluded that he was within the normal limits for a number of range of motion evaluations. *Id.* at 865.

Mr. Carter submitted years of other medical and physical records, going back to late 2011. *Id.* at 471-623. While some of the records submitted by Mr. Carter support his claim, others support Aetna's basis for denial. *Compare id.* at 525, 552, 601, 868 *with id.* at 546-47, 565, 636-39, 876.

On January 27, 2017, Dr. Totta completed a functional capacity questionnaire that Mr. Carter's counsel prepared.[12] *Id.* at 434-37. At that time, Dr. Totta had not seen or contacted Mr. Carter since May 17, 2016. *Id.* at 437. In the questionnaire, Dr. Totta stated Mr. Carter had "chronic neuropathic pain left side of body" and identified "chronic and persisting pain", "chronic and severe fatigue", and "limitations in concentration, attention, and focus due to pain" as symptoms Mr. Carter experienced.[13] *Id.* at 434. In the questionnaire, question seven states:

> Based on your medical and clinical expertise, your knowledge of and treatment relationship with Mr. Carter, since December 21, 2015, if Mr. Carter attempted to return to full-time employment, do you believe that due to the combination of his severe conditions/diagnoses, he likely would miss at least 1 to 2 workdays per month? [Dr. Totta responded: "Yes"].

---

[12]   Aetna qualifies this assertion. *Def.'s Opp'n to Pl.'s App.* ¶ 23. Aetna concedes that Dr. Totta completed the questionnaire on January 27, 2017 but questions its accuracy given that Dr. Totta stated he had not seen or contacted Mr. Carter since May 17, 2016. *Id.* In response to question twelve of the questionnaire, which states: "If you have any additional comments regarding Mr. Carter's severe condition, symptoms, and/or their impact on his day to day function, please add the [illegible] here," Dr. Totta responded "[f]illed out from last visit on 5/17/16 – have not seen or contacted patient since." *Administrative R.* at 437. For context, the Court includes Dr. Totta's statement that he had seen or contacted Mr. Carter since May 17, 2016.

[13]   Mr. Carter asserts "[i]n this completed Questionnaire, Dr. Totta states that the Plaintiff suffers from chronic neuropathic pain in the left side of his body which causes chronic and persisting pain, chronic and severe fatigue, and limitations in concentration and focus due to pain." *Pl.'s App. of Facts* ¶ 25. Aetna qualifies this assertion in that "Dr. Totta does not state anything related to a 'causal Relationship' as Plaintiff suggests [and] Plaintiff quotes from two separate and distinct sections of the sheet to support this allegation." *Def.'s Opp'n to Pl.'s App.* ¶ 25. Aetna notes again that "the questionnaire was completed eight months after Plaintiff last visited with Dr. Totta." *Id.*

   The Court includes the two sections of the questionnaire cited by Mr. Carter but, in light of the record, omits "which causes." Because the Court already noted the lapse between when Dr. Totta filled out the questionnaire and the last time he saw or contacted Mr. Carter, the Court does not again note this lapse.

*Id.* at 435. Below question 7 of the questionnaire, it states, "[p]lease explain your answer to this Question" and Dr. Totta wrote "intolerable pain."[14] *Id.* Dr. Totta recommended that Mr. Carter would need "seated/supine breaks 10 minutes every hour" if he attempted to return to full-time employment.[15] *Id.* at 436. Dr. Totta noted that Mr. Carter could walk or stand for an "unlimited" amount of time but that it would cause pain flares, and so he would "recommend the restriction at the [illegible] with 5-10 minute seated/supine break." *Id.* at 435.

In January 2017, Aetna asked Dr. Totta, if Mr. Carter attempted to return to full-time employment, how often his symptoms would interfere with his ability to complete a normal 8-hour workday and 40-hour work week without interruption from his physically-based symptoms. *Id.* at 426. On January 27, 2017, Dr. Totta wrote that the combination of Mr. Carter's severe conditions/diagnoses "rarely to occasionally" (defined in the questionnaire as between 5% and 1/3rd of a normal eight-hour workday and forty-hour work week) would interfere with his ability to complete a normal eight-hour workday and forty-hour work week without interruption from

---

[14] Mr. Carter asserts, "[d]ue to intolerable pain, Dr. Totta believes that since December 21, 2015, if the Plaintiff attempted to return to full-time employment, he would miss at least 1-2 workdays per month." *Pl.'s App. of Facts* ¶ 26 (internal quotation marks omitted). Aetna qualifies this statement. *Def.'s Opp'n to Pl.'s App.* ¶ 26. Aetna again notes that Dr. Totta had not seen or contacted Mr. Carter since May 17, 2016 and that it does not know what Dr. Totta "believes." *Id.* Because the Court has already included the lapse between when Dr. Totta last saw or contacted Mr. Carter, the Court will not include it again. The Court modifies Mr. Carter's assertion to reflect the record.

[15] Mr. Carter asserts that "Dr. Totta further believes that since December 21, 2015, if the Plaintiff attempted to return to full-time employment, he would need seated/supine breaks 10 minutes every hour." *Pl.'s App. of Facts* ¶ 27 (internal quotation marks omitted). Aetna qualifies this assertion in that it does not know what Dr. Totta actually "believes", and that Dr. Totta states that Mr. Carter could stand or walk for an unlimited amount of time, "but . . . pain flares" would require the seated/supine breaks. *Def.'s Opp'n to Pl.'s App.* ¶ 27. The Court modifies Mr. Carter's assertion to track the record and, as the record reflects, the Court has included the other information Aetna cited.

his physically-based symptoms. *Id.* The scale on the questionnaire is as follows: "Never", "Rarely", "Rarely to Occasionally", "Occasionally", indicating "Rarely to Occasionally" falls within the middle of the scale.[16] *Id.* Dr. Totta further indicated that if Mr. Carter attempted to return to full-time employment, the combination of his symptoms, including his pain from his severe conditions/diagnoses, would interfere "occasionally to frequently", defined in the questionnaire as between one-third to one-half a normal eight-hour workday and a forty-hour work week, with "his ability to maintain his attention and concentration needed to perform his normal work duties."[17] *Id.* Lastly, Dr. Totta indicated that he believed that Mr. Carter was being honest with him in describing his symptoms and how those symptoms were impacting his normal functioning. *Id.*[18]

---

[16]    Mr. Carter asserts: "Dr. Totta additionally believes that since December 21, 2015, if the Plaintiff attempted to return to full-time employment, the combination of his severe conditions/diagnoses rarely to occasionally, (defined in this Questionnaire as between 5% and 1/3rd of a normal 8-hour workday and 40-hour work week) would interfere with his ability to complete a normal 8-hour workday and 40-hour work week without interruption from his physically-based symptoms." *Pl.'s App. of Facts* ¶ 28 (internal quotation marks omitted). Aetna qualifies this assertion by stating it does not know what Dr. Totta actually "believes" and by identifying the ranges of the scale Dr. Totta indicated, which it says corresponds to the middle of the scale. *Def.'s Opp'n to Pl.'s App.* ¶ 28. The Court modifies Mr. Carter's assertion to reflect the record and includes the scale as provided for in the Questionnaire.

[17]    Mr. Carter asserts: "Further, Dr. Totta believes that since December 21, 2015, if the Plaintiff attempted to return to full-time employment, the combination of his symptoms, including pain from his severe conditions/diagnoses would interfere 'occasionally to frequently' (defined as between 1/3rd and one-half of a normal 8-hour workday and 40-hour work week) with his ability to maintain his attention and concentration needed to perform his normal work duties." *Pl.'s App. of Facts* ¶ 29. Aetna qualifies this assertion in response in that it "does not know what Dr. Totta actually 'believes'" and again notes that Dr. Totta stated he had not been in contact or seen Mr. Carter since May 17, 2016. *Def.'s Opp'n to Pl.'s App.* ¶ 29. The Court modifies Mr. Carter's assertion to reflect the record and since the Court has already noted the time gap between when Dr. Totta saw Mr. Carter last it will not insert it again.

[18]    Mr. Carter asserts "Dr. Totta believes that the Plaintiff has been honest with him in describing his symptoms and the impact of his symptoms on his normal functioning." *Pl.'s App. of Facts* ¶ 30. Aetna denies this assertion. *Def.'s Opp'n to Pl.'s App.* ¶ 30. Aetna again says Dr. Totta has not contacted or seen Mr. Carter since May 17, 2016, and that in any event, "Dr. Totta's belief as to Plaintiff's honesty is irrelevant." *Id.*

Mr. Diaz concluded that "[t]he information submitted and the attorney's summary is not sufficient to overturn denial" and returned the matter to Aetna's appeal unit. *Id.* at 60.

### e.     Independent Review of Mr. Carter's Claim

Aetna determined that an independent peer reviewer specializing in physical medicine and rehabilitation and pain management was needed to review Mr. Carter's file. *Id.* at 68-70. Dr. Howard Grattan, board certified by the American Board of Physical Medicine and Rehabilitation and American Board of Physical Medicine and Medicine, Pain Management, conducted this assessment. *Id.* at 383, 391. Dr. Grattan completed his review of Mr. Carter's file on February 22, 2017. *Id.* at 391.

Dr. Grattan noted that Mr. Carter was using atenolol, venlafaxine, and cannabis. *Id.* Dr. Grattan determined that Mr. Carter had "the ability to lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently." *Id.* at 390. Dr. Grattan found that Dr. Totta's conclusion that Mr. Carter must have "breaks 10 minutes per every hour . . . [was] not well supported, as he does not have any ongoing neurological deficits" and that he could perform these tasks consistently for eight hours per day or forty hours per week. *Id.* Ultimately, Dr. Grattan found that Mr. Carter did not have ongoing neurological deficits and that the records did not demonstrate any cognitive deficits that would prevent employability. *Id.*

---

The Court includes Dr. Totta's belief as to Mr. Carter's honesty in regard to his symptoms and the impact they have on his normal functioning because it speaks to Dr. Totta's medical evaluation of Mr. Carter, which impacts his professional opinion of Mr. Carter's symptoms and their effect on him. All of this is relevant to the propriety of Aetna's denial of Mr. Carter's claim for long-term disability benefits.

On February 27, 2017, Aetna sent Dr. Grattan's report to Dr. Totta and asked him to review and report to Aetna what within the Grattan report he agreed and disagreed with. *Id.* at 164. On March 30, 2017, Dr. Totta contacted Aetna, and in his conversation with an Aetna disability appeal consultant, the phone record reads:

> When asked if Dr. Totta agreed with the clinical report or if the appeal review would benefit from him speaking directly to the reviewing physician, Dr. Totta noted that he would have nothing further to add of benefit. Dr. Totta noted that he can understand how the conclusions of the clinical report were arrived at.

*Id.* at 291. Dr. Totta also informed the disability appeal consultant that "he could not provide objective physical changes to explain what changed" regarding "the time that [Mr. Carter] worked vs when he went out of work." *Id.* In a letter dated April 3, 2017, Aetna informed Mr. Carter that it was upholding its decision to deny him long-term disability benefits and cited this independent assessment as one of the primary bases. *Id.* at 181.

## II.     POSITION OF THE PARTIES

### A.     Mr. Carter's Motion

Mr. Carter concedes that the arbitrary and capricious standard applies to this Court's review of his claim. *Pl.'s Mot.* at 5.[19] Mr. Carter argues that Dr. Grattan's report reviewing the chronology of Mr. Carter's medical treatment is inaccurate

---

[19]     As noted earlier, Mr. Carter moved to amend his Complaint to assert that the Court should apply a de novo standard of review of Aetna's denial of benefits. *Mot. to Amend the Compl.* (ECF No. 16). On May 17, 2018, the Magistrate Judge denied the motion to amend but allowed the parties to address the proper standard of review in the motions for judgment. *Decision and Order on Pl.'s Mot. to Amend* (ECF No. 21). In his motion for judgment, Mr. Carter wrote that the "arbitrary and capricious standard of review applies to Defendant's Decision on the Plaintiff's claim." *Pl.'s Mot.* at 5. The Court concludes that Mr. Carter has waived his earlier argument that a de novo standard of review applies.

because it: (1) misstates Mr. Carter's physical therapist's conclusion on his ability to perform work tasks; (2) omits critical sections of Dr. Totta's treatment note from April 2015; (3) omits crucial facts from Dr. Pisini's assessment of Mr. Carter; (4) confirms in Dr. Grattan's view that Mr. Carter has severe and chronic neuropathic pain unresponsive to treatment; (5) ignores the fact that the record contradicts Dr. Grattan's conclusion that Dr. Biser did not specify what factors trigger Mr. Carter's pain. *Id.* at 6-10. As a result, Mr. Carter contends Aetna erred in relying on Dr. Grattan's review. *Id.* at 10. Mr. Carter also argues that this shows Aetna did not perform an independent assessment on Mr. Carter's medical records. *Id.*

Mr. Carter avers that the record contradicts Dr. Grattan's opinion that he is capable of performing tasks such as lifting, carrying, pushing, and pulling twenty pounds occasionally, and ten pounds frequently, as well as kneeling, bending, crouching, squatting, and climbing stairs occasionally, among others in light of the administrative record. *Id.* Specifically, Mr. Carter argues there is substantial evidence in the administrative record demonstrating that Dr. Grattan is wrong in his conclusion that Mr. Carter "does not have any neurologic deficits." *Id.* at 12-13. Mr. Carter further argues that the administrative record illustrates that his chronic pain interferes with his ability to focus and concentrate on his work tasks. *Id.* at 13.

Mr. Carter says Dr. Grattan mischaracterizes Mr. Carter's claim as being about an actual cognitive deficit, whereas his claim concerns severe and chronic pain which subsequently interferes with his focus and concentration. *Id.* at 13-14. Mr. Carter claims Dr. Grattan's opinions as to his functional physical capacity are not

supported by substantial evidence, and Mr. Carter highlights various medical records which he asserts demonstrate that specialists who saw Mr. Carter agree that he "has continuing constant, chronic and severe pain in his left upper and lower extremities, and that his pain has not responded to many different treatment modalities . . .." *Id.* at 15-17. Unlike Dr. Grattan, Mr. Carter maintains that Dr. Totta's conclusions as to his functional capacity are well-supported by the opinions of the specialists he has seen. *Id.* at 18. Taken altogether, Mr. Carter argues the Court should find that Aetna's denial of his long-term disability claim was arbitrary and capricious given the various alleged flaws of Dr. Grattan's review of his claim, and because Aetna relied on Dr. Grattan's review. *Id.*

### B.    Aetna Life Insurance Company's Motion

Aetna asserts that it has discretionary authority to interpret the long-term disability plan, that this Court reviews Aetna's interpretation under an arbitrary and capricious standard, and that the Court should uphold Aetna's conclusion as long as it was reasonable and substantially supported by the administrative record. *Def.'s Mot.* at 13. Aetna claims Mr. Carter has the burden to show that he is entitled to benefits under the plan. *Id.* (citing *Morales-Alejandro v. Medical Card Sys.*, 486 F.3d 693, 700 (1st Cir. 2007)). Aetna argues that "in the presence of conflicting evidence, it is entirely appropriate for a reviewing court to uphold the decision of the entity entitled to exercise its discretion." *Id.* at 14 (citation omitted).

Aetna says the administrative record provides ample support for its decision. *Id.* It maintains that Mr. Carter submitted contradictory and inconclusive evidence

to support his claim. *Id.* at 14-15. It argues that Mr. Carter "did not meet his burden of proof as he failed produce any medical evidence that he was functionally impaired from working at his own occupation, but instead provided evidence that he was in fact able to perform his sedentary occupation." *Id.* at 15 (citation omitted). Aetna cites *Tracia v. Liberty Life Assurance Company of Boston*, 164 F. Supp. 3d 201, 223 (D. Mass. 2016), to support its position that it acted within its discretion in requiring objective evidence from Mr. Carter that he could not gainfully work. *Def.'s Mot.* at 16. Aetna says that it placed Mr. Carter on notice in an early August 2016 letter that it desired objective evidence. *Id.*

To reach its decision, Aetna claims it did not rely solely on Mr. Cartier's failure to submit sufficient documentation of his claim. *Id.* at 16-17. Aetna points out that it retained Dr. Grattan to perform an independent physician review and Aetna contacted Dr. Totta. *Id.* at 17. Aetna asserts it provided Dr. Totta with a copy of Dr. Grattan's report and that Dr. Totta "noted that if he were asked what changed from the time that the claimant worked vs when he went out of work, Dr. Totta stated that he could not provide [']objective physical changes['] to explain what changed." *Id.*

Aetna concedes that it has a structural conflict of interest as it both determines whether Mr. Carter is eligible for benefits and must pay those benefits. *Id.* at 19 n.11 (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008)). However, Aetna argues this does not change the standard of review and that it is just a factor to consider in determining whether Aetna abused its discretion. *Id.* at 19. Aetna avers that it is Mr. Carter's burden to demonstrate that this structural conflict did in fact lead to the

decision to deny his claim, and that he has failed to carry this burden. *Id.* at 19-20. Aetna also maintains that it should prevail even if the Court uses a de novo review. *Id.* at 18. Finally, it asserts that if the Court were to reverse and remand its decision under the terms of the policy, Mr. Carter is not entitled to more than twenty-four months of benefits. *Id.*

## C. Mr. Carter's Response

Mr. Carter contends that while the insurer "can give conflicting opinions [different][20] weight, it cannot reinvent the evidence before it." *Pl.'s Opp'n* at 2 (emphasis omitted) (quoting *Kennard v. Unum Life Ins. Co.*, 211 F. Supp. 2d 206, 221 (D. Me. 2002)). Mr. Carter maintains that Dr. Grattan mischaracterized the findings of Mr. Carter's physical therapist as well as his chiropractor, and omitted material portions of Dr. Totta's assessment. *Id.* at 3-5. Mr. Carter disputes Dr. Grattan's view that the medical records do not show he has any neurologic deficits by pointing to numerous instances in which treating medical professions discussed Mr. Carter's neurologic limitations. *Id.* 6-7. He also contends that Dr. Grattan's conclusions are not supported by the record and are not well-reasoned because Dr. Grattan failed to accurately acknowledge Mr. Carter's unsuccessful attempts to use different modalities to treat his chronic and severe pain. *Id.* at 7-9. Taken as whole, Mr. Carter asserts that Aetna's denial of his claim was arbitrary and capricious. *Id.* at 10.

## D. Aetna Life Insurance Company's Response

---

[20] Mr. Carter's opposition inserts the term, "differing," in place of the term, "different," found in the *Kennard* opinion. *Compare Kennard*, 211 F. Supp. 2d at 221, with *Pl.'s Opp'n* at 2. The Court uses the term from the Magistrate Judge's opinion, not Mr. Carter's memorandum.

Aetna claims that Mr. Carter's motion lacks sufficient legal support to overturn Aetna's denial of his long-term disability benefits. *Def.'s Opp'n* at 2. They say Mr. Carter uses "false assumptions; . . . red herrings in the record; and cherry-pick[s] facts and quotes while conveniently omitting others from the same doctors." *Id.* Aetna also takes issue with Mr. Carter's view that Ms. Corbin, Aetna's disability appeal consultant, relied solely on Dr. Grattan's report. *Id.* According to Aetna, Ms. Corbin reviewed all the information contained in Mr. Carter's file. *Id.*

Aetna argues that Mr. Carter "confuses the legal standard" and that it is his burden to show that he is entitled to benefits under ERISA and to show that Aetna's decision to deny the benefits was arbitrary and capricious. *Id.* at 3. Aetna maintains that Dr. Grattan conducted a full and thorough review of Mr. Carter's medical records. *Id.* at 4. It lists examples illustrating what it categorizes as Mr. Carter "cherry-picking" facts to paint Dr. Grattan as inaccurate, when the record in fact shows the opposite. *Id.*

Aetna takes issue with Mr. Carter's claim that there is substantial evidence in the record showing that Mr. Carter has neurologic deficits and that his pain hinders his ability to work. *Id.* at 5. As to the former, Aetna points to Mr. Carter's primary physician, Dr. Totta's, statement that Mr. Carter "had no specific neurological deficit or object incapacity." *Id.* (internal quotation marks omitted). Aetna argues that what Mr. Carter claims as substantial evidence is in truth only subjective complaints of pain insufficient to prove an objective neurological condition. *Id.* at 5-6. Aetna reiterates that it requested Mr. Carter provide objective evidence to support his claim.

*Id.* Aetna says its request for objective evidence supporting Mr. Carter's claim "was both reasonable and supported by precedent." *Id.* at 6 (citing *Colassi v. Hartford Life & Accident Ins. Co.*, No. 10-cv-562-PB, 2012 U.S. Dist. LEXIS 67754, at *20 (D.N.H. May 12, 2012) (quoting *Maniatty v. UNUMProvident Corp.*, 218 F. Supp. 2d 500, 504 (S.D.N.Y. 2002), *aff'd*, 62 F. App'x 413 (2d Cir. 2003))). Aetna claims it notified Mr. Carter that he needed to provide objective records to support his claim but Mr. Carter did not so. *Id.* at 7.

Aetna avers that Mr. Carter's pain does not interfere with his ability to work, and he presented contradicting evidence in his initial application. *Id.* Aetna says "[t]he issue here is not whether Plaintiff suffers from any maladies . . .. [But] whether Plaintiff is able to perform the material duties of his own occupation as it is performed in the national economy." *Id.* at 8. Aetna contends Mr. Carter "did not meet his burden of proof as he failed to produce any medical evidence that he was functionally impaired from working at his own occupation, but instead provided evidence that he was in fact able to perform his sedentary occupation." *Id.* Aetna asserts that the record is unclear as to whether Mr. Carter's physical health in January of 2016 changed and rendered him unable to work. *Id.* Around January of 2016, Mr. Carter's son died and Aetna states that while this is "unfortunate," Mr. Carter's personal issues are "not an objective medical basis upon which to make a determination as to his physical ability to work a sedentary job." *Id.* at 9. Aetna says even if Mr. Carter succeeds, his claim for relief is overbroad and that he entitled to at most twenty-four months of benefits. *Id.*

## III. LEGAL STANDARD

"In the ERISA context, summary judgment is merely a vehicle for deciding the case[.]" *Bard v. Bos. Shipping Ass'n,* 471 F.3d 229, 235 (1st Cir. 2006) (citation omitted). Unlike with a summary judgment motion, where the Court considers evidence submitted by the parties, the Court evaluates whether the denial of ERISA benefits was proper based only on the administrative record. *See id.* Additionally, the "non-moving party is not entitled to the usual inferences in its favor." *Id.* (citation omitted). It is the duty of the administrator to weigh conflicting evidence. *Vlass v. Raytheon Emps. Disability Tr.*, 244 F.3d 27, 32 (1st Cir. 2001) (citation omitted).[21] Consequently, "the district court sits more as an appellate tribunal than as a trial court[,]" *Leahy v. Raytheon Co.*, 315 F.3d 11, 18 (1st Cir. 2002), and determines "not which side [it] believe[s] is right, but whether the insurer had substantial evidentiary grounds for a reasonable decision in its favor." *Brigham v. Sun Life of Can.*, 317 F.3d 72, 85 (1st Cir. 2003) (citation omitted).

The parties agree that the arbitrary and capricious standard applies to the Court's review of Aetna's denial of Mr. Carter's claim. *Pl.'s Mot.* at 5; *Def.'s Mot.* at 13; *see also Buffonge v. Prudential Ins. Co. of Am.*, 426 F.3d 20, 28 (1st Cir. 2005) (citation and internal quotation marks omitted) (where plan administrator has discretionary authority to determine eligibility for plan benefits, the plan administrator's decision should "be reversed only if arbitrary, capricious, or an abuse

---

[21] This District's Local Rules illustrate the unique procedural approach the Court undertakes in ruling on motions for judgment on the administrative record. D. ME. LOC. R. 16.1(a)(6), 16.2(c)(4); *see also* SPECIAL PROCEDURES FOR ERISA BENEFIT CASES (FIRST CIRCUIT), ERISA SURVEY OF FED. CIRCUITS § 1.VIII.D (2016).

of discretion"). The analysis "focuses on whether the record as a whole supports a finding that the plan administrator's decision was 'plausible,' 'or, put another way, whether the decision is supported by substantial evidence in the record.'" *O'Shea v. UPS Ret. Plan*, 837 F.3d 67, 73 (1st Cir. 2016) (quoting *Niebauer v. Crane & Co.*, 783 F.3d 914, 923 (1st Cir. 2015)). "Substantial evidence . . . means evidence reasonably sufficient to support a conclusion." *Doyle v. Paul Revere Life Ins. Co.*, 144 F.3d 181, 184 (1st Cir. 1998). The fact that the record reflects contradictory evidence does not by itself mean the administrator's decision is not supported by substantial evidence. *See Gannon v. Metro. Life Ins. Co.*, 360 F.3d 211, 213 (1st Cir. 2004). The Court must uphold Aetna's denial "if there is any reasonable basis for it." *Morales–Alejandro v. Med. Card Sys., Inc.*, 486 F.3d 693, 698 (1st Cir. 2007) (quoting *Madera v. Marsh USA, Inc.*, 426 F.3d 56, 64 (1st Cir. 2005)).

The Court's deference is not as generous to the administrator when the insurer, as here, has a structural conflict, meaning where an administrator "both evaluates claims for benefits and pays benefits claims." *Glenn*, 554 U.S. at 108, 111, 117 (2008); *Wallace v. Johnson & Johnson*, 585 F.3d 11, 15 n.2 (1st Cir. 2009) ("The deference may be less generous where the deciding entity has a financial stake in the outcome"). In such circumstances, the standard of review is not altered, but the significance of the conflict depends on details of that case. *See Glenn*, 554 U.S. at 117.

In *Glenn*, the United States Supreme Court held that, where there is such a conflict, a court should weigh the conflict "as a 'factor in determining whether there is an abuse of discretion.'" *Id.* at 115 (quoting *Firestone Tire & Rubber Co. v. Bruch*,

489 U.S. 101, 115 (1989) (quoting Restatement (Second) of Trusts § 187, cmt. d (Am. Law Inst. 1959))). The conflict "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." *Id.* at 117. Mr. Carter "bears the burden of showing that the conflict influenced the Plan administrator's decision in some way." *Troiano v. Aetna Life Ins. Co.*, 844 F.3d 35, 45 (1st Cir. 2016).

## IV. DISCUSSION

### A. Structural Conflict

Although Mr. Carter is critical of Dr. Grattan and Ms. Corbin, he does not assert that Aetna's structural conflict influenced their decision-making. *Pl.'s Mot.* at 5-18. As it is Mr. Carter's burden to demonstrate that Aetna's conflict—being both the entity which "evaluates claims for benefits and pays benefits claims"—influenced its decision to deny his claim, *Glenn*, 554 U.S. at 112, Mr. Carter has not met this burden as he has not raised this argument.

Nevertheless, the First Circuit has written that courts are "duty-bound to inquire into what steps a plan administrator has taken to insulate the decisionmaking process against the potentially pernicious effects of structural conflicts." *Cusson*, 592 F.3d at 224 (quoting *Denmark v. Liberty Life Assur. Co.*, 566 F.3d 1, 9 (1st Cir. 2009)). Here, Aetna offered evidence of its efforts to reduce any

potential bias by instituting policies designed to isolate claim and appeal assessments from financial considerations and retaining Dr. Grattan to provide an independent physician review. *See Decl.* ¶¶ 12-19; *Administrative R.* at 173. Thus, under *Glenn*, the Court considers Aetna's structural conflict as a "factor in determining whether there is an abuse of discretion." *Glenn*, 554 U.S. at 115.

## B.  Reasonableness and Substantial Evidence

The parties agree that Aetna retained the discretionary authority in administrating claims, and so the arbitrary and capricious standard of review applies. *Pl.'s Mot.* at 5; *Def.'s Mot.* 13. The Court must consequently uphold Aetna's decision "if there [is] any reasonable basis for it." *Morales–Alejandro*, 486 at 698 (citation omitted).

The record demonstrates that Aetna had substantial evidence and a reasonable basis to deny Mr. Carter's claim. Mr. Carter has the burden to establish he is entitled to long-term disability benefits under the Plan. *Id.* at 700. Here, that means that Mr. Carter had to show that he could not "perform the material duties of [his] own occupation solely because of disease or injury; and [his] work earnings are 80% or less of your adjusted predisability earnings." *Administrative R.* at 1043. Mr. Carter's position had a sedentary physical demand level. *Id.* at 10, 1104.

In its first denial letter, Aetna informed Mr. Carter that it was unclear what caused him to be unable to work in December 2015, that the submitted medical records lacked objective measures supporting his claim, and that he could appeal and submit additional objective information such as test results and x-rays for Aetna to

review. *Id.* at 155-57. The First Circuit recognizes that some medical conditions, like fibromyalgia and chronic fatigue syndrome, are characterized by an absence of objective findings. *See Cook v. Liberty Life Assur. Co. of Bos.,* 320 F.3d 11, 21 (1st Cir. 2003) (citing *Vega v. Comm. of Social Security*, 265 F.3d 1214, 1219 (11th Cir. 2001); *Rose v. Shalala*, 34 F.3d 13, 18 (1st Cir. 1994); *Sisco v. HHS*, 10 F.3d 739, 744 (10th Cir. 1993) (alterations in ordering)); *see also Maher v. Mass. Gen. Hosp. Long Term Disability Plan*, 665 F.3d 289, 304 (1st Cir. 2011) (Lipez, J., dissenting) (citation omitted) ("Our court has emphasized before that in dealing with hard-to-diagnose, pain-related conditions, it is not reasonable to expect or require objective evidence supporting the beneficiary's claimed diagnosis").

Mr. Carter has not claimed that his disabling condition— "chronic neuropathic pain and complex regional pain syndrome on the left side of his body, status-post cervical discectomy and fusion on January 15, 2015"—is a condition that, like fibromyalgia, is difficult to objectively establish. Indeed, Mr. Carter has undergone three spinal surgeries—lumbar surgery in 2002, a cervical microlaminotomy in 2012, and a cervical discectomy and fusion in 2015—and a May 6, 2015 MRI had revealed a disk bulge with right-sided annular tear at L4-5. Aetna's demand for objective evidence was directed to the fact that Mr. Carter had been employed in a sedentary position at BIW and had continued to work in this position until December 20, 2015. Aetna asked Mr. Carter to provide objective corroboration for his claim that something changed so that he unable to continue to perform the work he had been successfully performing.

Aetna had the right to require objective evidence from Mr. Carter that he could not physically perform the sedentary functions of his estimating analyst position. Even with diagnoses difficult to objectively corroborate, the First Circuit observed:

> While the diagnoses of chronic pain syndrome and fibromyalgia may not lend themselves to objective clinical findings, the physical limitations imposed by the symptoms of such illnesses do lend themselves to objective analysis.

*Id.* Here, Aetna sought objective evidence as to Mr. Carter's ability "to perform the material duties of his own occupation as it is performed in the national economy." *Def.'s Mot.* at 15; *Administrative R.* at 155-57. It was appropriate for Aetna to ask for objective documentation supporting Mr. Carter's claim that he was disabled as defined within the Plan, and that he could not perform the material functions of his sedentary work position. *See Boardman*, 337 F.3d at 17 n.5 (1st Cir. 2003); *Ellis v. Unum Life Ins. Co. of Am.*, No. 2:13-CV-00080-JAW, 2014 WL 235212, at *21-23 (D. Me. Jan. 22, 2014); *Falk v. Life Ins. Co. of N. Am./Cigna Grp. Ins.*, Civil No. 12–cv–178–JL, 2013 WL 5348189, at *11 (D.N.H. Sept. 23, 2013). Although Aetna did not dispute that Mr. Carter has had various medical afflictions, primarily related to his spine, Aetna questioned whether Mr. Carter was disabled under the Plan's definition of the term. *Def.'s Mot.* at 15.

As Dr. Totta noted in his telephone conversation with Aetna, Mr. Carter presents a difficult case. *Administrative R.* at 291. Mr. Carter argues that Aetna, specifically Ms. Corbin, the disability appeal consultant who reviewed Mr. Carter's claim, relied only on Dr. Grattan's assessment and that his assessment was flawed for a multitude of reasons. *Pl.'s Mot.* at 5. However, a review of Aetna's letter

detailing its decision to uphold its denial of Mr. Carter's claim states, "[o]ur review included all of the information contained in your client's claim and appeal file." *Administrative R.* at 180. It goes on to say that the letter does not contain all information Aetna reviewed. *Id.* As Aetna highlighted, at the request of Mr. Carter's counsel, it made Mr. Carter's entire Aetna file available to him. *Id.* at 339. While Mr. Carter asserts that Ms. Corbin's investigation only generated "fifteen pages of claim notes" along with Dr. Grattan's report, the record is not clear that this is all Ms. Corbin's investigation entailed, and Mr. Carter carries the burden to show that Aetna's denial was arbitrary and capricious. *Ellis*, 2014 WL 235212, at *22 (citation omitted).

Aetna asserts that this is not the case, *Def.'s Opp'n* at 2-4, and that the record illustrates that some of Mr. Carter's own doctors "were not certain as to his ability to work." *Id.* at 3 (citing *Administrative R.* at 952); *see also Administrative R.* at 953 ("patient's capacity is limited by perceived pain – there is no specific neurological deficit or objective incapacity . . .."). It is true that Dr. Totta, whose opinions Mr. Carter regards as "critical to deciding [his long-term disability] claim," *Pl.'s Mot.* at 6, at times casts doubt on Mr. Carter's ability to perform his duties as an estimating analyst. *Administrative R.* at 435-36, 1100-01. But when Dr. Totta contacted Aetna during its review of Mr. Carter's appeal, he stated he could "understand how the conclusions of the clinical report [prepared by Dr. Grattan] were arrived at." *Id.* at 291.

When asked "what changed from the time that [Mr. Carter] worked [versus] when he was out of work, Dr. Totta stated that he could not provide objective physical changes to explain what changed." *Id.* Ms. Corbin cited this conversation in her letter to Mr. Carter affirming Aetna's denial of his claim, *Id.* at 183, and Aetna asserts it shows that Ms. Corbin did not deny Mr. Carter's appeal based solely on Dr. Grattan's report. *Def.'s Opp'n* at 4. Moreover, Dr. Totta's acknowledgment that "he could not provide objective physical changes" to explain why Mr. Carter was no longer able to work in a sedentary capacity tracks one of Aetna's initial bases for denying Mr. Carter's claim: the lack of objective evidence detailing why Mr. Carter was no longer capable of working as an estimating analyst.

Even assuming Ms. Corbin only relied on Dr. Grattan's review of Mr. Carter's medical records, Dr. Grattan's assessment that Mr. Carter could perform the material duties of his occupation was reasonable and supported by substantial evidence. The First Circuit Court of Appeals has concluded that "the existence of contrary evidence does not, in itself, make the administrator's decision arbitrary." *Gannon*, 360 F.3d at 213; *Tsoulas v. Liberty Life Assur. Co. of Bos.*, 454 F.3d 69, 78 (1st Cir. 2006).

Mr. Carter assails Dr. Grattan's assessment as incomplete, unsupported, and not well-reasoned. *Pl.'s Mot.* at 5-19. Mr. Carter is correct that it seems that Dr. Grattan's summation of Mr. Carter's physical therapist's conclusions was inaccurate as the summation omitted the physical therapist's notations that Mr. Carter had "not fully achieved" the ability to perform work tasks such as keyboarding in that he could perform the task but with pain or that Mr. Carter had "not yet achieved" being "[a]ble

to sleep for greater than 6 hours without waking in pain." *Compare Administrative R.* at 652, with *id.* at 168. But a mere inaccuracy by a medical reviewer or plan administrator does not render the review of a claim arbitrary and capricious. *Cf. Whitehouse v. Raytheon Co.*, 672 F. Supp. 2d 174, 179 (D. Mass. 2009) (plan administrator's denial of claimant's appeal was arbitrary and capricious given that plan administrator repeatedly mischaracterized the findings of claimant's doctors, failed to address important evidence in the record, and did not support its factual assertions).

Mr. Carter's remaining arguments against Dr. Grattan's report are either belied by the record or overstate the perceived insufficiencies of Dr. Grattan's assessment. Mr. Carter says Dr. Grattan omitted critical points of Dr. Totta's April 24, 2015 treatment note. *Pl.'s Mot.* at 7. However, a comparison of Dr. Totta's treatment note and Dr. Grattan's summary of that note do not show glaring omissions. While not everything is reiterated within Dr. Grattan's summary, that does not consequently make it an unreasonable summary. As Mr. Carter admits, much of Dr. Grattan's summary of Dr. Totta's is accurate, and the gist of Dr. Totta's note is that the source of Mr. Carter's pain is not clear, and this point is found in Dr. Grattan's summary.

Mr. Carter also contends that Dr. Grattan fails to properly acknowledge Dr. Pisini's diagnoses and the ineffectiveness of different treatments with Mr. Carter. *Id.* at 8-9. Mr. Carter, however, also states that his "severe and chronic neuropathic pain has been unresponsive to multiple treatment therapies since his cervical discectomy

34

and fusion surgery, [which] is confirmed throughout Dr. Grattan's recitation of the Plaintiff's treatment history." *Id.* at 9. A review of Dr. Grattan's recitation of Mr. Carter's medical history confirms this. Therefore, although Dr. Grattan does not include all of Dr. Pisini's conclusions in his summary of that record, as Mr. Carter acknowledged, Dr. Grattan does not omit the key underlying information.

Mr. Carter avers that Dr. Grattan mischaracterizes Dr. Biser's conclusions as to her uncertainty about what aggravates Mr. Carter's pain. *Id.* at 9-10; *Pl.'s Opp'n* at 4. Mr. Carter is correct that on June 27, 2016, Dr. Biser lists activities that aggravate Mr. Carter's pain. *Pl.'s Mot.* at 9-10 (citing *Administrative R.* at 775). But Dr. Grattan is citing the record from June 29, 2016, where Dr. Biser also notes that Mr. Carter's "pain seems to come and go without any specific aggravating factor that he can identify." *Administrative R.* at 773; *see also id.* at. 811 ("he can't pinpoint exactly what causes [pain] to flare up"). In his assessment, Dr. Grattan notes that his summary of Mr. Carter's chiropractic therapy spans from September of 2015 to June 29, 2016. *Id.* at 169. Although Mr. Carter may disagree with the evidence Dr. Grattan emphasized, "it is [Aetna's] responsibility, not the [C]ourt's, to weigh the conflicting evidence." *Kennard*, 211 F. Supp. at 211 (citing *Vlass*, 244 F.3d at 32; *Terry v. Bayer Corp.*, 145 F.3d 28, 40 (1st Cir. 1998)).

Outside the alleged inaccuracies of Dr. Grattan's assessment, Mr. Carter asserts that Dr. Grattan's report is not well-reasoned and not supported by the evidence. *Pl.'s Mot.* at 11-18. Dr. Grattan reviewed the capabilities and limitations worksheet by Dr. Totta from May 27, 2016, in which Dr. Totta stated, "patient's

capacity is limited by perceived pain – there is no specific neurological deficit or objective incapacity . . ..” *Administrative R.* at 166, 953. Dr. Grattan notes that Aetna previously denied Mr. Carter's claim because of a lack of medical documentation showing that he was incapable of performing as an estimating analyst. *Id.* at 166. Dr. Grattan also reviewed Dr. Totta's attending physician statement from May 5, 2016. *Id.* In that statement, Dr. Totta stated, "[p]atient's restrictions due to his intolerance of left sided pain – there are no objective physical restrictions – unable to objectify." *Id.* at 1101; *see also id* at 452 (Dr. Nakamura states Mr. Carter is "not able to focus on tasks due to chronic pain" and notes significant physical limitations but also says Mr. Carter can still do "activities of daily living").

Mr. Carter claims Dr. Grattan "reinvented" the evidence. *Pl.'s Mot.* at 15 (quoting *Kennard*, 211 F. Supp. 2d at 211). He also says the Court should give more weight to Dr. Totta's opinions than to Dr. Grattan's. *Id.* at 18. In *Kennard*, a Magistrate Judge of this District was presented with whether a plan administrator's denial of disability benefits due the claimant's alleged pre-existing conditions was reasonable and supported by sufficient evidence. 211 F. Supp. 2d at 209. Regarding one of the two disputed pre-existing conditions, the plan administrator inferred that the claimant's previous back injury was brought about by the same activity that resulted in the claimant's second back injury six months later. *Id.* at 221. The only evidence that linked these two injuries was the plan administrator's medical reviewer's own inference. *Id.* As a result, the Court noted that while the plan

administrator may afford "conflicting opinions different weight, it cannot reinvent the evidence before it." *Id.*

In contrast to *Kennard*, the record here does not show that Dr. Grattan drew inferences unsupported by the documentation presented to him to arrive at his conclusions but that he weighed conflicting opinions from the different medical professionals who treated Mr. Carter. It is Aetna's duty to weigh the evidence before it, not the Court's; the Court's role is to determine whether there was a reasonable basis for Aetna's decision. *Vlass,* 244 F.3d at 32; *see also Prince v. Metro. Life Ins. Co.*, No. CIV. 08-CV-471-JL, 2010 WL 988730, at *13 (D.N.H. Mar. 16, 2010) (citation and internal quotation marks omitted) (upholding administrators' denial of benefits even though "[t]he record here is capable of supporting competing inferences as to the extent of the plaintiff's ability to work").

To uphold the Aetna's denial, the Court does not decide whether the Aetna "was right, but [there was] substantial grounds for a reasonable decision in its favor." *Anderson v. Liberty Mut. Ins.*, 17-cv-00346-JAW, 2018 WL 3521176, at *7 (D. Me. July 20, 2018) (quoting *Brigham*, 317 F.3d at 85). Given the record before the Court, despite Aetna's structural conflict, the Court concludes Aetna had a reasonable basis and sufficient evidence to deny Mr. Carter's claim.

## V. CONCLUSION

The Court GRANTS Aetna Life Insurance Company's Motion for Summary Judgment on the Administrative Record (ECF No. 24) and DENIES Colon L. Carter's Motion for Judgment on the Administrative Record (ECF No. 22).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 2nd day of January, 2019